Herbert, J.
Both parties to this appeal state the question of law at issue here, as follows:
“Is the defendant-employer in a workmen’s compensation case entitled to judgment as a matter of law when the claimant’s medical evidence presents only ‘a causal relationship’ between the death of plaintiff’s decedent and an industrial accident?”
The record shows that plaintiff’s husband died February 18, 1953, at Youngstown, Ohio, from Hodgkin’s disease, a malignant condition of the lymph glands which spreads to other parts of the body and invariably results in death. This condition was first diagnosed at the time of the removal of a lymph gland from the left side of Senvisky’s neck on August 4, 1951, when the pathologist at the hospital determined that he was suffering from “reticulum cell sarcoma,” which the testimony *525 established is a manifestation of Hodgkin’s disease. During the periods from August 14 to August 24 and September 7 to September 14, 1951, he was given deep X-ray therapy on the left side of his neck by a Dr. Heberding (called as a state witness) to whom he had been referred by a Dr. Mermis, the decedent’s personal physician who had removed the gland.
In August of 1952, Dr. Heberding resumed X-ray treatments on decedent’s neck, most of these treatments being on the right side “because he had some glands appearing on the right side of his neck at that time.”
Dr. Heberding also testified as to deep X-ray treatments of Senvisky’s lumbar and abdominal regions, during the period from September 3 through October 17, 1952, treating him through the back, both sides and front because of lumps he could feel in the abdomen. All these treatments were for the lymph gland condition, according to Dr. Heberding.
On April 16, 1952, the decedent, then employed in the shipping department of defendant, was injured while engaged in loading steel hanger doors in a railroad gondola car, when a string of other cars, being pushed by a locomotive, struck a crane which was being used to load the doors into the car. He was thrown by the impact against the side of one of these doors, striking his head and back. For a short period of time he was dazed and when he regained his senses he wás out of the car and “down on the ground, but I felt pretty good then.” He remained at work the rest of the day, doing light-work, but the pain in his back became severe that evening so that he reported to the company dispensary the nest day, where he received heat treatments on his back at intervals for a period of about one month. In the month of June following, an appendectomy was performed on him by his physician, Dr. Mermis.
Dr. Goudsmit was called as a witness on behalf of plaintiff. He saw the decedent the first time on July 10, 1952, and the second time on November 26, 1952. The decedent was referred to him by the pathologist at the hospital “who was taking the place of Dr. W. 0. Mermis, who had been, and still was Mr. Senvisky’s regular physician and surgeon.” Dr. Goudsmit, whose speciality was internal medicine, testified that the Hodgkin’s disease, as it was diagnosed in November 1952, *526 was “exactly the same thing that was called ‘reticulum cell sarcoma’ ” by the pathologist in 1951. Following the decedent’s second visit, Dr. G-oudsmit placed him in the hospital from November 30,1952, to January 31,1953, and again from February 15,1953, until his death three days later. After a recitation of the facts of the injury of April 16 and the medical history of the decedent as a foundation for the inquiry, he was asked and answered the following hypothetical question:
“Doctor, I wish you to further assume your findings and diagnosis throughout the entire period of time that you saw Mr. Senvisky, both at the office and during his hospitalization, but exclude any history given you by Mr. Senvisky, and limiting your opinion, if you have one, to the facts contained in this question, I will ask you if you have an opinion as to whether or not there is a probable causal relationship between the incident described as occurring on April 16, 1952, when he struck his back, the symptoms that followed and the cause of his death on February 18th, 1953, from Hodgkin’s disease? a* * #
“A. Yes, I do have an opinion.
“Q. What is your opinion as to the causal relationship? a # # #
“A. It is my opinion that there exists a causal relationship between the accident in which Mr. Senvisky was involved in April of 1952, and the death which incurred [occurred] on February 18, 1953.”
The second medical witness for the claimant was a practicing physician in the city of Columbus, Ohio, specializing in internal medicine, who was called as an expert to render an opinion. He never knew or saw the decedent in his lifetime or after death. After testimony as to the nature of Hodgkin’s disease, the following hypothetical question, based upon a recitation of the facts of the accident and illness, was asked and answered:
“Assuming, doctor, those facts to be true, and limiting your opinion as to the facts contained in this hypothetical question, I will ask you if you have an opinion as to whether there is or is not a probable causal relationship either by way of causa *527 tion, aggravation, or acceleration between the incident described to you as happening at the plant of the Truscon Steel Company on April 16, 1952, when he struck his back, the symptoms that followed, and the cause of his death on February 16, 1953, from Hodgkin’s disease? í Í * * *
“A. Yes, sir.
“Q. And what is that opinion, doctor? ii # * #
“A. That there is a causal relationship.”
Both witnesses gave reasons for their opinions, but their explanations did not explain or expand their statements that there was “a causal relationship.” Since the death of Senvisky resulted from Hodgkin’s disease, which admittedly existed in his system prior to August 1951, the testimony of these two medical expert witnesses is particularly important.
In the case of McNees v. Cincinnati Street Ry. Co., 152 Ohio St., 269, 89 N. E. (2d), 138, this court held in paragraph four of the syllabus that death benefits under the Workmen’s Compensation Act can be awarded only where the death was the proximate result of a compensable injury. In the opinion, at page 275, Taft, J., stated:
“Although there is no statutory provision requiring a proatimate causal relationship between a compensable injury and a death for which compensation is sought, this court has frequently held that it is necessary for a death claimant to establish that such an injury was the proximate cause of the death. Aiken v. Industrial Commission, 143 Ohio St., 113, 53 N. E. (2d), 1018; Gwaltney, a Minor, v. General Motors Corp., 137 Ohio St., 354, 30 N. E. (2d), 342; and Weaver v. Industrial Commission, 125 Ohio St., 465, 181 N. E., 894.”
In the Aiken case an effort was made to establish that death of an employee from acute myocarditis was attributable to a prior compensable knee injury. The medical witness, testifying as an expert, answered a lengthy hypothetical question by stating that in.his opinion there was a causal relation between Harry Aiken’s injury and his death. In the syllabus in that case, it was held that “the proof offered must show such injury *528 was a proximate cause of death, and must include evidence by competent medical witnesses that a probable relationship existed between the original accident and the myocarditis.”
In the Weaver case it was stated in the per curiam opinion that “the plaintiff * * * has to establish that the injury was the proximate cause of th¿ death or was the proximate cause of the acceleration of death.” '
In the case of Fox v. Industrial Commission, 162 Ohio St., 569, 125 N. E. (2d), 1, the question presented was stated in the opinion by Hart, J., as follows:
“The principal question to be determined * * * is: Where, in a hearing on a workmen’s compensation claim, a hypothetical question is propounded to a medical witness for the purpose of establishing causal connection between an accidental injury and succeeding harm or disability, may such question inquire as to ‘a causal relationship’ or must it inquire as to ‘a direct or proximate causal relationship’?”
This court, in affirming the judgment below, held in the first paragraph of the syllabus:
“In order to establish a right to workmen’s compensation for harm or disability claimed to have resulted from an accidental injury, it is necessary for the claimant to show by a preponderance of the evidence, medical or otherwise, not only that his injury arose out of and in the course of his employment but that a direct or proximate causal relationship existed between his injury and his harm or disability.”
It is true that in that case it was held that questions and answers as to “a causal relationship,” such as were asked and given in this case, were improperly excluded, but in the opinion it is stated:
“However, the evidence here proffered was insufficient in itself to prove a direct or proximate causal relationship, and, in the absence of other evidence to cure the insufficiency, its exclusion was harmless error.”
Although plaintiff’s two medical expert witnesses both testified, in answer to hypothetical questions, that there was ‘ ‘ a causal relationship” between decedent’s injury and death, their reasons for such opinions were, in the words of the Fox case, *529 as quoted above, “insufficient in * # * [themselves] to prove a direct or proximate causal relationship. ”
There is a further issue raised in this case relating to the question of acceleration of death. This theory of recovery for death on the ground that it was accelerated by an injury aggravating an existing ill-health condition seems to have been brought into Ohio law in the Weaver case, supra, as discussed in several subsequent decisions.
In Ackerman v. Industrial Commission, 131 Ohio St., 371, 3 N. E. (2d), 44, this court held that in order for a death to be compensable, the claimed diseased condition must have existed at the time of injury. That case, however, followed the Weaver case in recognizing the acceleration theory.
Also in point is the syllabus in the case of State, ex rel. Republic Rubber Division, Lee Tire & Rubber Corp., v. Morse et al., Industrial Commission, 157 Ohio St., 288, 105 N. E. (2d), 251, which reads:
“Where a workman protected by the Workmen’s Compensation Act receives an injury in the course of and arising out of his employment which injury directly causes his death or aggravates a pre-existing diseased condition and his death is thereby accelerated, his dependents, as designated by Section 1465-82, G-eneral Code [Section 4123.59, Revised Code], are entitled to the compensation provided for in such section.”
In that case the employer sought to advance the theory that the compensation to be awarded should be, as stated by Stewart, J., “a sum of money proportionate to the period of time by which the injury shortened decedent’s life.” That theory was rejected in that case, but a limitation has since been placed on parties seeking to establish compensable death claims under the acceleration theory.
In the recent case of McKee v. Electric Auto-Lite Co., ante, 77, 151 N. E. (2d), 540, this court held that “under the Workmen’s Compensation Act, death from a pre-existing cause and accelerated by an accidental injury, in the course of and arising out of employment, is compensable, where the death is accelerated by a substantial period of time as a direct and proximate result of the accident.”
*530 In that case, the decedent had incurred an injury to his finger in the course of his employment, and the claim was made that the injury accelerated his death. The cause of death in the death certificate was given as coronary occlusion with antecedent cause as coronary arteriosclerosis with thrombosis. In that opinion, the language of Stewart, J., at page 82, is well worth repeating here:
“In the present case, as we have shown from an analysis of the testimony of plaintiff’s expert witness, his answer left only a speculation or guess as to any acceleration of McKee’s death by the accident he sustained, in spite of the witness’s words to the effect that his opinion was that there was a direct and causal connection between the accident and the acceleration of the death.
“If we are to continue to hold, despite no provision therefor in the statute, that a death from a pre-existing cause and accelerated by an accidental injury is compensable as a death claim under the statute, there must be a substantial causal relationship between the accident and the accelerated death, and such relationship can not be proved by mere magic words of direct causation without evidence to definitely support it.” See, also, Larrissey, Admx., v. Norwalk Truck Lines, Inc., 155 Ohio St., 207, 98 N. E. (2d), 419, and Lopresti v. Community Traction Co., 160 Ohio St., 480, 117 N. E. (2d), 2.
Continuing the thoughts expressed above, it would seem that when we hold that death from a pre-existing disease is compensable where it is substantially accelerated directly because of a compensable injury, we are virtually stating in another manner that the injury is the proximate cause of death. This brings us then to the facts in the instant case.
The petition of the plaintiff alleges that the decedent’s injury of April 16, 1952, “activated, aggravated or accelerated a previously existing condition of ill being in said decedent which directly and proximately caused his death on February 18,1953.”
For evidence on the question of acceleration of death, we must look to the testimony of the two medical experts presented by plaintiff here. The second medical witness, giving his rea *531 sons as to his opinion that there was “a causal relationship,” testified as follows:
“We have hero an individual dying of Hodgkin’s disease, which is a disease of the glands which is almost invariably fatal. In this disease, it causes a progressive loss of weight, causes anemia, fever, and so forth. We don’t know the cause of Hodgkin’s disease, and our treatment is yet quite unsatisfactory. We use X-ray treatment; we use mustard gas, and we use cortisone, and what have you.
“These patients seem to do all right for a while. They build up then i nn down. There are certain metabolic changes that occur that cause an acceleration or aggravation of the already existing disease.
“We have here an individual who had this disease prior to an injury; an injury which occurred on April 16, 1952, from the facts given me in this hypothetical question.
“it appears that he had a rather protracted backache subsequent to this occurrence. In fact, this backache lasted almost to the time of his death, and he was diagnosed of a backache.
“In addition to that, he died ten months after his injury.
“It is my belief that any circumstances that would lower this man’s resistance to an underlying disease such as an injury described in this hypothetical quéstion should be considered an aggravating factor for the hastening of the death of this decedent, therefore, I related my opinion.”
Certainly this testimony does not shed any light on the question as to whether decedent’s death was accelerated by the injury and, if so, by any substantial period of time.
Coming back to Dr. Goudsmit’s testimony, he testified that on four.occasions in a ten-day period in December 1952 he gave the decedent nitrogen mustard treatments, stating later that “it’s quite conceivable in my own mind probably, that had his bone marrow not been damaged by the X-ray treatment I might have been able to give Mr. Senvisky enough nitrogen mustard to suppress his Hodgkin’s process, and he might still be living today.”
This testimony reflects only the opinion that probably, but *532 for Dr. Heberding’s deep X-ray treatments, administered not for the injury but for the disease, he, Dr. Goudsmit, might have prolonged the decedent’s life with nitrogen mustard treatments. However, the record also shows the following testimony by Dr. Goudsmit:
“Q. Now, was this an average length of time between onset and death, or a short period of time from onset to death, or a long period of time from onset to death; considering your experience in dealing with this disease, Hodgkin’s disease? A. 1 ’d say it is within the average. Maybe a little bit shorter than the average run now, but I wouldn’t say it was remarkably so short.”
Under the rules established in the cases cited and discussed herein, there is no evidence to raise a jury question as to whether the disease of which Senvisky died was aggravated by his injury or whether the death was proximately accelerated by the injury, and certainly none as to acceleration by a substantial period of time.
The judgment of the Court of Appeals which reversed the judgment of the Court of Common Pleas and entered final judgment for the plaintiff is reversed, and final judgment is entered for the defendant.

Judgment reversed.

Weygandt, C. J., Zimmerman, Stewart, Taft, Bell and Matthias, JJ., concur.